UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
DEBRA M. MAHON,

                Plaintiff,

       - against -

CAROLYN COLVIN,

                Defendant.
--------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
15-CV-02641 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Debra Mahon ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration's ("SSA") denial of her claim for Disability

Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts.

13, 15.)  Plaintiff seeks reversal of the Commissioner's decision and an immediate award of

benefits, or alternatively, remand for further administrative proceedings.  The Commissioner seeks

affirmation of the denial of Plaintiff's claims.  For the reasons set forth below, the Court GRANTS

Plaintiff's motion for judgment on the pleadings and DENIES the Commissioner's motion.  The

case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I.    PROCEDURAL HISTORY

      Plaintiff applied for DIB on May 26, 2011, claiming disability beginning on May 1, 2009.

(Tr. 12, 17.)[1]  She was 32 years old on the onset date of her alleged disability.  (Tr. 132.)  On

January 6, 2012, the SSA denied Plaintiff's claim.  (Tr. 12.)  Plaintiff requested a hearing before

---

[1] "Tr." refers to the Administrative Transcript.  Page references are to the continuous
pagination of the Administrative Transcript supplied by the Commissioner.

an administrative law judge ("ALJ") on January 13, 2012. (*Id.*)  On February 6, 2013, Plaintiff applied for Supplemental Security Income ("SSI").  (Tr. 167.)  On May 30, 2013, ALJ Jack Russak held a video hearing ("ALJ Hearing"), where Plaintiff and her attorney appeared in Staten Island, New York, and the ALJ presided from Jersey City, New Jersey.  (Tr. 12.)  On August 28, 2013, the ALJ denied Plaintiff's DIB and SSI claims and found Plaintiff not disabled under sections 216(i) and 223(d) of the Social Security Act.  (Tr. 22.)  On March 12, 2015, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review.  (Tr. 1–5.)  Plaintiff timely filed this action on May 7, 2015, seeking review of the ALJ's decision.  (Dkt. 1.)

## II.   ADMINISTRATIVE RECORD

### A.  Non-Medical Evidence

#### 1.   Plaintiff's Testimony at the ALJ Hearing

At the May 30, 2013 ALJ Hearing, Plaintiff testified before the ALJ that she had a high school education and worked for several different employers between 1998 and 2009.  (Tr. 33, 47.)  In her most recent employment, Plaintiff worked as a customer service supervisor.  (Tr. 48–49.)  Plaintiff was terminated from most of her jobs, including the last one, because, according to her, she "couldn't keep up, couldn't prioritize, couldn't pay attention" and because she would occasionally miss work.  (Tr. 42.)  Plaintiff's absences fluctuated, and she would miss work more than twice a month at times when she felt "depressed" and "didn't want to go in."  (Tr. 43.)

Plaintiff informed the ALJ that she "struggled with a lot of ups and downs" throughout her life, including two failed marriages.  (Tr. 41.)  She could "get very aggressive in some senses, get very . . . vulgar . . . very physical."  (Tr. 37.)  When the depression occurred, she "[did not] sleep, [would] get tired, [would] cry a lot . . . oversleep and [would not] shower."  (Tr. 37.)  Plaintiff

testified that every few months there would be instances when she did not want to shower or get out of bed, and sometimes such situations would "last a couple of days" or "a week." (Tr. 43–44). Plaintiff stated that she had trouble maintaining attention and remembering appointments. (Tr. 44.) She had one close friend, but was not close with her family because of altercations and fights over the years. (Tr. 38, 45.)

Plaintiff lived with her two children, who were eleven and two-and-a-half years old at the time of the hearing. (Tr. 31–32.) She testified that she had a driver's license and drove her two children to her mother's home for babysitting. (Tr. 32.) Plaintiff also brought her daughter to school. (Tr. 39.) She testified that she cooked for herself and her children, shopped, washed clothes, and cleaned the apartment, but she seemed to indicate that she could not cook, shop, do laundry, or clean on a regular basis.[2] (Tr. 38–39.) She maintained a checking account, used a computer, engaged in social media, and could do basic math. (Tr. 32–33.) In July, 2012, Plaintiff went to Mexico for vacation. (Tr. 37.) She stated that her medications made her feel "mentally numb." (Tr. 36.)

### 2. Vocational Expert Testimony

The rest of the ALJ Hearing was devoted to the vocational expert's ("VE") opinions as to whether jobs existed in the national economy for an individual of Plaintiff's age, education, work experience, and Residual Functional Capacity ("RFC"). The VE testified that someone with Plaintiff's age, education, and work experience, with the ability to perform "simple, routine tasks . . . in a low stress job having only occasional decision making, only occasional changes in the work setting . . . with only occasional judgment . . . [and] occasional interaction with the public . . . co-workers, and . . . supervision," would not be able to engage in Plaintiff's past work. (Tr.

_____

[2] "Yeah, I mean I do all these things. It's just how on a regular basis." (Tr. 38.)

49–50.)  The VE noted that under the Dictionary of Occupational Titles ("DOT"),[3] the following three occupations could be available to Plaintiff based on the ALJ's hypothetical: small products assembler, linen room attendant, and bench assembler.  (Tr. 50–51.)  When the ALJ added a restriction that the person was not able to perform fast-paced work, the VE stated that the two assembly jobs would no longer be available, but that the person could do the work of a mail clerk or a retail price marker.  (Tr. 51–52.)  The VE testified that if a person went off task between five to 20 percent of the time, or if the person had more than one unscheduled absence per month, there would be no jobs available at all.  (Tr. 52–53.)  The VE testified that if the person was off task more than seven percent of the time, there would be no jobs available.  (Tr. 53.)

### 3.     Letter of Employment Termination

Plaintiff submitted to the Appeals Council a letter dated January 27, 2014, informing Plaintiff that her employment as a customer service supervisor with Flat Rate Long Distance, Inc. had been terminated immediately due to "poor performance and violation of company pol[i]cies."  (Tr. 326.)

## III.    MEDICAL EVIDENCE

### 1.     Treating Physicians

#### a.   *Dr. Elizabeth Fitelson, M.D.*

Dr. Fitelson, a psychiatrist and expert in treating mental illness during pregnancy and the postpartum period, started treating Plaintiff in July 2010—when Plaintiff was 13 weeks pregnant.

---

[3] The DOT is an extensive listing of jobs and job descriptions prepared by the United States Department of Labor.  The DOT gives each job type a specific code—for example, "295.467–026 Automobile Rental Clerk"—and establishes, among other things, the minimum skill level (*e.g.*, "unskilled," "semi-skilled," and "skilled") and physical exertion capacity (*e.g.*, "sedentary," "light," "medium," "heavy," etc.) required to perform that job.  *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012).

(Tr. 237, 305.)  At that time, Plaintiff reported that she was not working, and lived with her ex-husband and daughter.  (Tr. 305.)  She presented for evaluation and treatment of Bipolar Disorder, and had a long history of affective instability dating to childhood, with prior self-destructive behaviors while manic, although she had not attempted suicide or been hospitalized, and was generally high-functioning.  (*Id.*)  Over the prior three years, her mood had been well-stabilized on Effexor and Neurontin in combination with regular psychotherapy.  (*Id.*)  However, Plaintiff had tapered all medications when she found out she was pregnant, and had become increasingly depressed and irritable, with worsening mood swings.  (*Id.*)  Plaintiff reported having mood swings every 30 seconds, crying all the time when she was home, and anhedonia,[4] stating that nothing made her happy.  (*Id.*)  Plaintiff was not sleeping at all; she would fall asleep and then wake up, tossing and turning with racing thoughts and rumination.  (*Id.*)  She was anxious about everything, had difficulty breathing, and would feel her anxiety in her chest.  (*Id.*)  Plaintiff reported going days without showering and "moping around."  (*Id.*)  She had low appetite and low energy, had lost weight, experienced feelings of hopelessness, and could be physically aggressive, having previously punched her husband in the head.  (*Id.*)

Plaintiff reported having abused alcohol and marijuana, and having tried multiple drugs, cocaine, and THC, though she was not on anything during the pregnancy.  (Tr. 306.)  Dr. Fitelson observed that Plaintiff was appropriately dressed, her attitude was cooperative, her speech was normal, her mood was depressed and anxious, her affect was tearful and anxious, and her thought process was normal.  (*Id.*)  Plaintiff denied suicidal or homicidal thoughts, and demonstrated intact judgment and good insight.  (*Id.*)

---

[4] Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable.  STEDMAN'S MEDICAL DICTIONARY 42670.

Dr. Fitelson wrote that Plaintiff presented with 6/9 criteria for an MDE[5] with prominent irritability, insomnia, hopelessness, and mood lability[6] that was significantly impacting her ability to function in multiple settings.  (*Id.*)  Dr. Fitelson prescribed Clonazepam.  (Tr. 307.)  Dr. Fitelson and Plaintiff discussed other drug options.  (*Id.*)

On July 30, 2010, Plaintiff met with Dr. Fitelson again.  (Tr. 310.)  Since the prior appointment, they had spoken on the phone several times, and Dr. Fitelson had prescribed Lamictal.  (*Id.*)  Dr. Fitelson reported that Plaintiff was doing better on medication.  (*Id.*)  During a visit on September 3, 2010, Plaintiff reported feeling depressed, anxious, and guilty after her daughter had been in a car accident.  (Tr. 312.)  Dr. Fitelson observed that Plaintiff's mood was irritable and anxious, her affect was euthymic,[7] and her thought process was normal.  (*Id.*)  Dr. Fitelson increased Plaintiff's dose of Lamictal.  (*Id.*)

On October 21, 2010, Plaintiff's mood had continued to improve, though she still reported being "slightly more depressed than her baseline."  (Tr. 314.)  She had been very busy and stressed, her irritability was "up and down," she was well functioning, and her appetite was normal.  (*Id.*)  Her mood was "OK."  (*Id.*)  Dr. Fitelson again increased Plaintiff's dose of Lamictal.  (*Id.*)

On March 24, 2011, Dr. Fitelson noted that Plaintiff had delivered her baby and that Dr. Fitelson had conducted phone sessions with Plaintiff over the past several months.  (Tr. 316.)  Plaintiff reported continuing to struggle with her mood and morale, in light of her acrimonious separation from her husband, financial pressures, and caring for a newborn.  (*Id.*)  She often felt

---

[5] Dr. Fitelson does not define an "MDE."

[6] Lability is free and uncontrolled mood or behavioral expression of the emotions. STEDMAN'S MEDICAL DICTIONARY 474140, 474150.

[7] Euthymia is moderation of mood that is not manic or depressed.  STEDMAN'S MEDICAL DICTIONARY 307600.

overwhelmed, but denied suicidal ideation, and continued to find regular sessions with her therapist helpful. (*Id.*) Plaintiff's mood was "not inappropriate" and dysphoric,[8] her affect was constricted, and her thought processes were normal, her judgment was intact and her insight was good. (*Id.*) Dr. Fitelson wrote that Plaintiff was currently taking Clonazepam and Lamotrigine. (*Id.*) The doctor wrote that despite Plaintiff's low mood, anxiety, and several stressors, she continued to function adequately caring for herself and her children, though she was unable to work at the time. (Tr. 316.)

In a May 2, 2011 letter, Dr. Fitelson summarized her treatment of Plaintiff. (Tr. 238.) She wrote that she had been meeting with Plaintiff on a monthly basis since July 2010. (Tr. 238.) Dr. Fitelson reported that Plaintiff had stopped all of her medications during pregnancy due to concerns about causing harm to the baby, and as a result of stopping medication, Plaintiff's mood and level of functioning had declined "precipitously." (*Id.*) Plaintiff exhibited symptoms consistent with a Major Depressive Episode: low mood, tearfulness, irritability, poor sleep, low energy, low appetite with several-pound weight loss (despite the pregnancy), anhedonia, and hopelessness. (*Id.*) Plaintiff was having severe anxiety with panic symptoms such as upset stomach, tightness in her chest, difficulty breathing, mood swings, and lability. (*Id.*) She had on a few occasions "act[ed] out physically toward her husband," though Dr. Fitelson reported that she had never put her children at risk. (*Id.*) Dr. Fitelson opined that Plaintiff's symptoms "significantly affected her ability to function in interpersonal as well as work settings." (*Id.*) Dr. Fitelson prescribed Lamotrigine, a mood stabilizer, as well as Clonazepam, an anti-anxiety medication for Plaintiff to improve her symptoms during pregnancy. (*Id.*) Thereafter, Plaintiff's

---

[8] Dysphoria is a mood of general dissatisfaction, restlessness, depression, and anxiety. STEDMAN'S MEDICAL DICTIONARY 273670.

symptoms improved, and her depression went into partial remission; however, she continued to be anxious and irritable, and continued to have poor functioning. (*Id.*) Dr. Fitelson wrote that Plaintiff's husband had left her during her pregnancy, which had had a "severe negative effect on her mental health and ability to function" and had led to severe stress, anxiety, and more depression. (*Id.*) Medical complications in the pregnancy had led Plaintiff to be on bedrest for several months, after which Dr. Fitelson had managed her treatment and medication by phone. (*Id.*) Dr. Fitelson reported that they remained in frequent contact via phone, and Plaintiff was compliant with treatment recommendations. (*Id.*) However, while on bedrest Plaintiff had become more isolated, and had difficulty caring for herself appropriately. (Tr. 237–38.)

After the baby was born, Plaintiff became more anxious and depressed, and required adjustment to her medication; Dr. Fitelson prescribed daily Lamotrigine and Clonazepam. (Tr. 238.) At the time of Dr. Fitelson's letter (May 2, 2011), she wrote that Plaintiff's symptoms were "somewhat improved" but that she remained able to function in only a limited capacity, due to depressive symptoms, anxiety, irritability, and mood lability. (Tr. 238.)

Dr. Fitelson also characterized Plaintiff's past psychiatric history in the May 2, 2011 letter. She stated that Plaintiff had had mood instability and anxiety since childhood, had experienced depressive symptoms for much of her adolescence, and had had several manic or hypomanic episodes involving self-destructive behavior, such as traveling across the country spontaneously, spending herself into debt, past (but not present) substance abuse, chaotic relationships, and poor judgment such as drunk driving. (Tr. 238.) Dr. Fitelson wrote that Plaintiff's last manic episode had been over two years before. (*Id.*)

Dr. Fitelson wrote that after Plaintiff's diagnosis of Bipolar Disorder, Plaintiff had been put on mood-stabilizing medication. (*Id.*) Her erratic behavior and symptoms had begun to improve, and she was able to develop stable relationships. (*Id.*)

Dr. Fitelson diagnosed Axis I-Bipolar Disorder Type I, with her most recent episode being depressed, Axis II-Borderline Personality Disorder, Axis III-Postpartum, and Axis IV-"Severe"-marital separation, and being a single mother for two small children. She stated that Plaintiff's global assessment of function (GAF) score ranged from 55 to 70.[9]

Dr. Fitelson opined that Plaintiff was currently not able to function in a work setting due to her Bipolar Disorder. She wrote that Plaintiff's pattern of mood instability and affective lability had significantly impaired her ability to work and had led to job losses. (Tr. 238, 247.) She wrote that Plaintiff's moderate depressive and anxiety symptoms were severe, and that her low energy, impaired concentration, irritability, anhedonia, and sleep dysregulation rendered her unable to perform adequately in a professional environment. (Tr. 247.) Dr. Fitelson wrote that Plaintiff's current situational stressors contributed to her symptoms, and that the stress of a work environment on top of those stressors would exacerbate her illness. (*Id.*) The doctor wrote that she expected Plaintiff to eventually return to a level of functioning that would enable her to work, but believed that her disability would likely persist for another 12 months. (*Id.*)

---

[9] The GAF, which was eliminated from the Diagnostic and Statistical Manual-5 in late 2013, is an "Axis V assessment for reporting a clinician's judgment of an individual's overall level of functioning at a given time." Global Assessment of Function (GAF), 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:243 (2nd ed.). The scale ranges from 1 to 100. A score of 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. Scores below 50 demonstrate increasingly greater impairment/symptoms and increasingly more limited function. *Id.*

Dr. Fitelson also completed a Psychiatric/Psychological Impairment Questionnaire on June 24, 2011. Dr. Fitelson diagnosed Plaintiff with Bipolar Disorder and Borderline Personality Disorder, with a current GAF score of 55. (Tr. 239.) Clinical findings included appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, generalized persistent anxiety, and hostility and irritability. (Tr. 240.)

Dr. Fitelson wrote that Plaintiff had difficulty maintaining appropriate behavior under strain, and would respond with irritability, impulsivity, and acting out. (Tr. 240.) Most recently Plaintiff had become more depressed, with poor concentration, withdrawal, and fearfulness. (*Id.*) Dr. Fitelson listed Plaintiff's primary symptoms as low mood, irritability, impaired concentration, guilt, social withdrawal, anxiety, increased sleep, and affective lability. (Tr. 241.)

Dr. Fitelson reported that Plaintiff had no limitations in her ability to remember locations and work-like procedures, understand, remember, or carry out instructions, ask simple questions or request assistance, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, or travel to unfamiliar places or use public transportation. (Tr. 242–44.) She reported that Plaintiff was mildly limited in her ability to make simple work-related decisions, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 243.)

Dr. Fitelson reported that Plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a

normal workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 242–43.)  Dr. Fitelson wrote that Plaintiff experienced episodes of deterioration or decompensation in work settings that would cause her to withdraw and/or experience exacerbation of signs and symptoms, explaining that under stress at work, Plaintiff exhibited inappropriate irritability and impulsivity, which resulted in her jobs ending.  (Tr. 244.)  Dr. Fitelson wrote that anxiety and poor concentration also impaired Plaintiff's functioning.  (*Id.*)

Finally, Dr. Fitelson reported Plaintiff's impairments were ongoing and would last at least twelve months, that Plaintiff was not a malingerer, could handle a low degree of work-related stress, had "good days" and "bad days," and was likely to be absent from work more than three times per month.  (Tr. 245–246.)

On May 12, 2011, Plaintiff reported to Dr. Fitelson that her mood had generally been stable, despite severe stressors.  (Tr. 318.)  She was anxious, had low appetite, and had lost weight.  (*Id.*)  However, she said she was coping with the extreme stressors of her divorce proceedings.  (*Id.*)  Dr. Fitelson found that Plaintiff's mood was anxious, her affect was constricted, and her thought processes were normal.  Her judgment continued to be intact and her insight continued to be good.  (*Id.*)  Dr. Fitelson wrote that Plaintiff was "generally doing well in terms of mood stability" on the Lamictal, although she had some dysphoria and anxiety related to acute and ongoing severe stressors.  (*Id.*)

On June 24, 2011, Plaintiff stated that she was feeling less stressed and that her appetite had improved, although she continued to feel socially isolated, and at times would get depressed

and not want to get out of bed or shower consistently. (Tr. 320.) When she would have conflict-ridden interactions with her ex-husband, she would experience extreme anxiety, distress, tearfulness, catastrophizing, but could "pull [her]self back together" after a few days. (*Id.*) She felt that the medication was helpful, and reported sleeping well because of being exhausted from the baby. (*Id.*) Dr. Fitelson reported that Plaintiff's mood was "OK, stressed," her affect was calm, and appropriate, and her thought processes were normal. (Tr. 320.) Dr. Fitelson wrote that Plaintiff's mood and anxiety were improved, although she still struggled with anxiety, distress tolerance, and some mood lability. (*Id.*)

On July 28, 2011, Plaintiff stated that she was "in general doing ok," and was managing as well as could be expected. (Tr. 322.) She reported that two weeks prior, she had been in a state of high anxiety for two days after receiving distressing news from her husband's lawyer. (*Id.*) In response, she exhibited irritability, decreased sleep, feelings of panic, and increased activity, and Dr. Fitelson opined that it sounded more like anxiety than hypomania. (*Id.*) Plaintiff reported that she continued to feel more isolated than her baseline, but attributed much of it to her situation as a single mother of two. (*Id.*) She reported that her mood was stable at times. (*Id.*) Dr. Fitelson reported that Plaintiff's mood was anxious, her affect was appropriate, and her thought processes were normal. (*Id.*)

### b. Dr. Merren Keating, Psy.D.

Dr. Keating, a licensed clinical psychologist, reported treating Plaintiff intermittently since September, 1994, when Plaintiff was 17 years old. (Tr. 286.) Plaintiff, however, did not meet with Dr. Keating between 2006 and May 14, 2013, during which time she had been in treatment with Dr. Brandwein. (Tr. 286–287.) Beginning on May 14, 2013, Plaintiff had been meeting with Dr. Keating every other week. (*Id.*)

On May 14, 2013, Plaintiff reported that she had had many problems, could not sleep or concentrate, that her moods were all over the place and that she was so anxious she could barely function. (Tr. 295.) She reported that a new relationship was helping her feel more stable, but that she was not sleeping because she was obsessing over whether her boyfriend was cheating on her. (*Id.*) She reported not being able to work, and stated that in the past she had messed up orders, gotten into verbal disagreements with bosses, and walked off the job when frustrated. (*Id.*) She believed that her bipolar symptoms were not responding to medication, and that her fluctuating moods and impulsive behaviors were causing a downward spiral. (*Id.*) Dr. Keating observed that Plaintiff's behavior during the session was restless, that she spoke rapidly with some evidence of circumstantial thinking, and was loud at times. (*Id.*) Her thought content was within normal limits, her mood was anxious with full expression, and she suffered from poor attention and concentration. (*Id.*) Plaintiff reported having great difficulty with short-term memory. Dr. Keating found that Plaintiff's insight and judgment were fair.

Dr. Keating reported in a letter dated May 18, 2013, that Plaintiff suffered from severe mood swings, impulsive behaviors, difficulty sleeping, some grandiosity, restlessness and agitation, distractibility, inability to concentrate, and racing thoughts. (Tr. 286.) At times, Plaintiff had also become severely depressed with an inability to get out of bed, insomnia and crying jags.[10] (Tr. 286.) Dr. Keating opined that all of these symptoms had made it impossible for Plaintiff to function in a work setting. (*Id.*)

On May 21, 2013, Plaintiff told Dr. Keating that she was out of control with spending money, that she had been very depressed, and consumed with feelings of worthlessness regarding

---

[10] Crying jags are periods of uncontrolled crying. Collins English Dictionary, https://www.collinsdictionary.com/dictionary/english/jag (last visited 3/31/17).

her mothering abilities. (Tr. 296.) She stated that she was often irritable with her family. (*Id.*) Dr. Keating reported the same observations about Plaintiff's mood and demeanor as at the prior session. (*Id.*) Dr. Keating wrote that Plaintiff seemed "quite lost" and needed structure and discipline in many areas of her life. (*Id.*)

Dr. Keating completed a Psychiatric/Psychological Impairment Questionnaire on June 18, 2013. She diagnosed Plaintiff with Bipolar I Disorder, with most recent episode hypomanic, and Borderline Personality Disorder, with a current GAF score of 46. (Tr. 287.) Her prognosis was poor. (*Id.*) Clinical findings included poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, manic syndrome, persistent irrational fears, generalized persistent anxiety, hostility, and irritability. (Tr. 288.) Dr. Keating reported that Plaintiff had moderate limitations in her ability to remember locations and work-like procedures, understand and remember one or two-step instructions, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently. (Tr. 290–92.) Dr. Keating reported that Plaintiff was markedly limited in her ability to: understand, remember, or carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a

normal workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 290–291.) She wrote that Plaintiff had experienced episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw and/or experience exacerbation of signs and symptoms. (Tr. 292.) She wrote that Plaintiff was under stress, and could be verbally abusive. (*Id.*)

Finally, Dr. Keating opined that Plaintiff's impairments were ongoing and would last at least twelve months, that Plaintiff was not a malingerer, that Plaintiff could tolerate a low degree of work-related stress at times, that Plaintiff had "good days" and "bad days"—but more bad days than good—and that Plaintiff was likely to be absent from work more than three times per month because of her impairments. (Tr. 293–294.) Dr. Keating reported that Plaintiff's current medication intake was Lamictal 300 mg. and Trileptal 150 mg. daily. (Tr. 292.)

### c. *Dr. David Brandwein, Psy.D.*

Dr. Brandwein, a licensed psychologist, treated Plaintiff beginning on October 12, 2007, after Dr. Keating referred Plaintiff to him. (Tr. 220.) His records were not included in the transcript. Plaintiff met with Dr. Brandwein on a weekly basis. In two letters—one dated April 8, 2011 and another dated August 20, 2011—Dr. Brandwein stated that at the time of intake, Plaintiff's symptom pattern corroborated Dr. Keating's diagnoses of Bipolar Disorder I and certain Cluster B Personality Disorder traits such as borderline, histrionic, and narcissistic disorders. (Tr. 220, 224) Plaintiff exhibited affective lability, frantic efforts to avoid real/imagined abandonment, impulsivity, feelings of emptiness, and outburst of rage. (*Id.*) She had periods where she felt depressed for most of the day nearly every day, experienced anhedonia, slept for extended periods

of time, and had little energy and diminished ability to concentrate. (*Id.*) During other periods, Plaintiff would experience an elevated mood, with increased self-esteem and decreased need for sleep, and impulsive behavior. (*Id.*)

Dr. Brandwein diagnosed Plaintiff with Bipolar Disorder I, Most Recent Episode Depressed, Moderate Without Psychotic Features. (Tr. 222.) He also diagnosed that she continued to show traits of Cluster B Personality Disorders, with borderline, histrionic, and narcissistic features. (*Id*.) These diagnoses were confirmed by recent psychological testing, with the Million Multiaxial Clinical Inventory-III (MCMI-III), on July 23, 2011. (*Id.*) Dr. Brandwein opined that the combination of mental health diagnoses, functional deficits, and stress from life events made it highly unlikely that Plaintiff would be able to secure and maintain any type of employment, full- or part-time. (*Id.*) Particularly relevant were Plaintiff's tendencies toward hypersomnia, decreased energy, and decreased ability to concentrate, all of which would seriously impact her ability to maintain a job in a competitive work environment. (*Id.*) He also found relevant her continuing difficulty in regulating her mood, which he opined may lead to future outbursts at supervisors and co-workers. (*Id.*) Dr. Brandwein believed that, because of Plaintiff's emotional problems, she could not perform a full-time job in a regular competitive work environment for at least the next 12 months. (*Id.*)

Dr. Brandwein also completed a Psychiatric/Psychological Impairment Questionnaire on July 1, 2011. He reported treating Plaintiff weekly between October 2007 and June 27, 2011. (Tr. 228.) He diagnosed Bipolar Disorder I, Most Recent Episode Depressed, Moderate" and "Borderline Personality Disorder; Plaintiff's GAF score was 52. (*Id.*) Clinical findings included appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or

concentrating, decreased energy, manic syndrome, generalized persistent anxiety, hostility and irritability. (Tr. 229.)

Dr. Brandwein found that Plaintiff had moderate limitations in her ability to remember locations and work-like procedures, understand and remember instructions, carry out instructions, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently. (Tr. 231–33.) Dr. Brandwein reported that Plaintiff was markedly limited in her ability to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 231–32.) Dr. Brandwein found that Plaintiff experienced episodes of deterioration or decompensation in work and work-like settings that caused her to withdraw and/or experience exacerbation of signs and symptoms. (Tr. 233.) He wrote that she experienced irritability and acting out aggressively. (*Id.*)

Finally, Dr. Brandwein reported that Plaintiff was not a malingerer, was incapable of dealing with even low degree of work-related stress, had "good days" and "bad days," and was likely to be absent from work more than three times a month as a result of her impairment. (Tr. 234–35.)

#### d. *Dr. Florence Tam, Psy. D.*

Dr. Tam treated Plaintiff on a bi-weekly basis between November 17, 2011 and November 9, 2012. (Tr. 277.) On an Intake Summary and Case Formulation Form, Dr. Tam noted that Plaintiff's chief complaints/presenting problems included bipolar disorder. (*Id.*) Dr. Tam also noted that Plaintiff had no history or current evidence of drugs or alcohol abuse. (*Id.*) Dr. Tam recorded that Plaintiff "didn't trust her own judgment", and was "constant[ly] thinking, constant[ly] worrying, [and] walking on eggshells," though Plaintiff "[hadn't] felt depressed in a couple of months." (*Id.*)

Dr. Tam's Progress Notes show that Plaintiff had been struggling with her relationships in life: she sought approval from her family but frequently got into fights with her mother (Tr. 278, 281 ("They never had a good relationship.")), and she felt insecure about her relationships with men and got upset with herself when one of her boyfriends cheated on her (Tr. 278–283). On four occasions in the Progress Notes, Plaintiff reported feeling better (Tr. 279, 280, 283, 284), but the vast majority of Dr. Tam's notes (from at least eighteen sessions) showed that Plaintiff was feeling nervous, anxious, worried, insecure, tired, and unmotivated. (Tr. 278–84). On January 9, 2012, Plaintiff reported feeling depressed and beginning to feel manic. (Tr. 279.) The last Progress Report from November 9, 2012 recorded that Plaintiff was "feeling better, been busy volunteering." (Tr. 284.)

Dr. Tam closed Plaintiff's case on February 5, 2013 because Plaintiff "cancelled multiple sessions without calling and did not return phone calls", and because Plaintiff "ha[d] an outstanding balance of $427.2 and ha[d] not made any attempts to pay off her balance." (Tr. 285.)

2. <u>Non-Treating Physicians</u>

*a. Dr. Richard King, M.D.*

Dr. King performed a psychiatric consultative examination of Plaintiff on November 14, 2011. (Tr. 248.) Dr. King noted that Plaintiff drove herself to the interview, was living with two children (nine months and nine years old), and performed routine activities such as watching television and playing on the computer. (Tr. 248–49.) Dr. King further noted that Plaintiff had had six jobs lasting one or two years each, had graduated high school, and had earned college credits. (*Id.*) Dr. King observed that Plaintiff showed "fair rapport" and "no acute distress," that Plaintiff's speech was clear and relevant, and that Plaintiff's intellectual functioning was in the average range. (Tr. 249.)

Dr. King wrote that Plaintiff had always been depressed and anxious, "first seeing a psychiatrist [at] age of 13", and was receiving Lamictal 200 mg a day. (Tr. 248.) He noted that Plaintiff had no history of psychiatric hospitalizations. (Tr. 248.) Dr. King observed that when Plaintiff was asked about her diagnosis of Bipolar Disorder, "there was no evidence of any grandiosity, religiosity, delusional thinking or suicidal behavior." (Tr. 249.) At the same time, Dr. King reported that Plaintiff was currently feeling anxious and depressed because her husband had just left her when she was eight months pregnant. (*Id.*)

In the end, Dr. King diagnosed Plaintiff with "Dysthymic Disorder Mild to Moderate Degree", and opined that Plaintiff had "a satisfactory ability to follow simple instructions and simple tasks and a fair ability with psychiatric treatment to follow complex instructions and complex tasks and interact with coworkers in a work setting." (Tr. 250.) Dr. King found no evidence of a bipolar disorder in the interview. (*Id.*)

### b. Dr. Robert F. Lopez, Ph.D.

State agency psychiatric consultant Dr. Lopez reviewed the record and performed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment on Plaintiff on January 5, 2012. (Tr. 255–68.) As part of Dr. Lopez's review, Dr. Lopez performed a consultative examination on Plaintiff. (Tr. 271.)

In the Psychiatric Review Technique, Dr. Lopez noted that Plaintiff had Affective Disorders, but the medically determinable impairment—though it existed—did not precisely satisfy the diagnostic criteria provided in the Psychiatric Review Technique. (Tr. 258.) Dr. Lopez wrote that Plaintiff had mood disturbance, accompanied by a full or partial manic or depressive syndrome. (*Id.*) Dr. Lopez reported that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, but no difficulties in maintaining concentration, persistence or pace, and had never had repeated episodes of deterioration. (Tr. 265.) Dr. Lopez further concluded that the evidence did not establish the presence of the "paragraph C" criteria under 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 266.)

In the Mental Residual Functional Capacity Assessment, Dr. Lopez noted that Plaintiff was only moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others. (Tr. 269–70.) Unlike Plaintiff's treating physicians, Dr. Lopez reported no marked limitations on any of Plaintiff's abilities. Dr. Lopez observed that Plaintiff was casually groomed and cooperative, that Plaintiff's speech was relevant and coherent "with no evidence of a thought disorder," and that her affect was friendly and well-modulated. (Tr. 271.)

In the final assessment, Dr. Lopez concluded that Plaintiff's allegations of difficulty due to bipolar and personality disorders were "credible, but not to the degree alleged." (*Id.*) Dr. Lopez reported that Plaintiff was currently receiving outpatient treatment, but stated that attempts to obtain current mental status information from the treating facility had been unsuccessful. (Tr. 271.) Dr. Lopez noted that Plaintiff may be precluded from performing tasks requiring a high degree of stress, implying that Plaintiff could tolerate a moderate degree of stress. (Tr. 271.)[11]

## DISCUSSION

## IV. STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing a final decision of the Commissioner, the Court's duty is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."

---

[11] The Transcript also includes two pages of handwritten notes by a Santapuri Rao, which the Court finds to be illegible. (Tr. 297–99).

*Id.* (internal citation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## V.  ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

In order to be found eligible for DIB benefits, claimants must be disabled as defined by the Act. Claimants are disabled under the meaning of the Act when they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must prove that the impairment is "of such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(b).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. §

404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled. However, if not, the claimant is disabled and is entitled to benefits. *Id.*

# VI. SSA DECISIONS

## A. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the SSA through June 30, 2015. (Tr. 14.) At the first step, he found that Plaintiff had not engaged in substantial gainful activity since May 1, 2009, the alleged onset date. (*Id.*)

At step two of his analysis, the ALJ determined that Plaintiff had three severe impairments: major depressive disorder, bipolar disorder, and borderline personality disorder. (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met a Listing. First, regarding activities of daily living, the ALJ found that Plaintiff had a mild restriction. (Tr. 15.) He relied upon Plaintiff's testimony that on a daily basis, she went shopping for food, cooked, cleaned dishes, and did laundry, could independently drive a car, sometimes went to the park, walked her daughter to school, used a computer, had a Facebook account, and had traveled to Mexico the prior year. (*Id.*) He noted that Plaintiff had testified that she would have periods where she did not regularly bathe, but found that, nonetheless, her restrictions were mild. (*Id.*)

In the area of social functioning, the ALJ found that Plaintiff's restrictions were moderate. (*Id.*) Again, he relied upon Plaintiff's testimony about going shopping, going to the park, traveling to Mexico, and taking care of her children. (*Id.*) He found that her statements "indicate[d] that she ha[d] the ability to be around other people." (*Id.*) The ALJ also noted her testimony about dating and volunteering. (*Id.*) He acknowledged that she testified about her aggressive and vulgar behavior, having been fired from her last job due to fighting, and not having a good relationship with her family. (*Id.*)

The ALJ found that Plaintiff's difficulties with regard to concentration, persistence or pace were moderate. He noted that she took care of her two children, drove, used a computer, handled a checking account, and independently performed activities of daily living. (*Id.*) He also relied again upon her volunteer work and trip to Mexico. (*Id.*) He acknowledged that she testified to not helping her daughter with homework, overspending, having a bad memory and difficulty focusing, having trouble sleeping, and side effects of her medication. (*Id.*) Finally, he stated that there was "no evidence, such as hospital records or treatment notes" indicating that Plaintiff had experienced any episodes of decompensation. (*Id.*) Thus, because he had not found that Plaintiff's impairments caused at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the paragraph B criteria were not satisfied. He found further that the paragraph C criteria were not satisfied because Plaintiff was able to function outside her home by shopping, driving, and taking her child to school. He stated that "there [was] no evidence" that Plaintiff had either had any episodes of decompensation or that "mental demands or changes in her environment would make her decompensate." (Tr. 16.)

Turning to his RFC analysis, the ALJ stated that after "careful consideration of the entire record," he found that Plaintiff had the RFC to perform a full range of work at all exertional levels, with the following nonexertional limitations: that she was limited to performing simple and routine tasks in a low-stress job, defined as having only occasional decision-making and occasional changes in the work setting. (*Id.*) He found that she needed to be off task for up to five percent of the day, and needed regularly scheduled breaks. He found that she was further limited to work with occasional judgment required on the job, and to occasional interaction with the public and co-workers. (*Id.*) He also found that she could not work in a fast-paced work environment. (*Id.*)

The ALJ also analyzed Plaintiff's credibility. (Tr. 16–17.) First, he acknowledged Plaintiff's testimony about her work-related difficulties, such as the fact that she was fired from her last job for fighting with her boss and missing work, that she would call out of work once a month, that her mental impairments resulted in difficulty focusing and remembering, and that she had testified to becoming aggressive and vulgar, crying all the time, and sometimes not bathing. (Tr. 17.) However, he noted that in contrast, she testified that she could cook, clean, shop, do laundry, use the computer, drive, and take care of her children. (*Id.*)

The ALJ acknowledged that Plaintiff had reported to her treating doctors anhedonia, sleepiness, hostility, psychomotor agitation, feelings of guilt, decreased energy, diminished ability to concentrate, as well as periods of elevated mood manifested by impulsive behavior, flight of ideas, and other manic behavior. (*Id.*)

The ALJ recited many of the findings of Drs. Keating, Brandwein, and Fitelson, as well as Drs. Tam and King. (Tr. 17–18.) He also noted that Plaintiff testified that she took medication and experienced side effects. (Tr. 18.)

He concluded that although he found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, he found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (*Id.*)

To support this finding of lack of credibility, he relied upon Dr. Fitelson's July 28, 2011 report that Plaintiff "was doing 'ok' on medication and her mood was becoming stable. (*Id.*) He noted that Dr. Fitelson had reported in May and June of 2011 that Plaintiff's prognosis was good for returning to her prior level of functioning and that her condition would likely persist for another year. (*Id.*) He noted that, while Dr. Fitelson reported on March 24, 2011 that Plaintiff was unable

to work, Dr. Fitelson had also reported that Plaintiff could adequately meet the needs of her children and herself, suggesting that Plaintiff's symptoms were not as significant as Plaintiff alleged. (*Id.*) The ALJ also relied upon Dr. Brandwein's statement that with treatment, Plaintiff would be able to return to work. (*Id.*) He further noted that while Plaintiff alleged that she could not work, she had told Dr. Tam on February 16, 2012 that she would like to find a job with flexible hours, "suggesting that [Plaintiff] believe[d] she ha[d] the ability to engage in work related activities." (*Id.*) He noted that she reported to her therapist on November 9, 2012 that she was "feeling better" and was busy volunteering. (Tr. 18–19.) He then found that she was not entirely credible because of the "numerous activities of daily living" previously discussed earlier in his opinion. (Tr. 19.)

The ALJ recited at length the opinions of consultative sources Drs. King and Lopez, and stated that he gave them "great weight because they based their assessment . . . on the results of [Plaintiff's] mental status examination and considered the claimant's subjective allegations and activities of daily living," and because their opinions were consistent with Plaintiff's reported activities of daily living. (*Id.*) He noted, however, that he gave little weight to Dr. Lopez's opinion that Plaintiff had no limitations with concentration, persistence, and pace, as inconsistent with Dr. King's opinion. (*Id.*)

The ALJ also relied upon selective findings of Dr. Fitelson, such as that Plaintiff had no limitations in her ability to understand and carry out simple or detailed instructions, respond to changes in the work setting, travel to unfamiliar places, and be aware of normal hazards, and had only mild limitations in her ability to make simple work-related decisions, interact with the public, and maintain socially appropriate behavior. (*Id.*) He acknowledged that Dr. Fitelson had found that Plaintiff had marked limitations in her ability to maintain attention and concentration, maintain

a schedule and ordinary routine, get along with coworkers, accept criticism from supervisors, and work in proximity to others without distraction, and that Plaintiff would be absent from work more than three times per month. (Tr. 19–20.) He concluded that he gave "some weight" to Dr. Fitelson's opinion as Plaintiff's treating psychiatrist, particularly because her opinion was substantiated by treatment notes. (Tr. 20.) However, he found that Dr. Fitelson's conclusions about Plaintiff's marked limitations were inconsistent with Plaintiff's reported activities of taking her children to school, driving a car, and performing other activities of daily living. (*Id.*)

The ALJ gave "little weight" to the opinions of Drs. Brandwein and Keating regarding Plaintiff's moderate and marked limitations in understanding and memory, sustained concentration and persistence, social interactions, and adaptation, their opinions that Plaintiff would be absent from work more than three times per month, and Dr. Brandwein's conclusion that Plaintiff was incapable of even low-stress work. (*Id.*) He gave these opinions little weight because there were no treatment records substantiating their opinions. (*Id.*) He also found that their opinions were inconsistent with Plaintiff's reported activities. (*Id.*) He also gave little weight to the treating doctors' GAF scores that ranged from 45 to 65, indicating mild symptoms in functioning to some impairment in reality testing or communication, because those scores were "highly subjective as they intertwine[d] psychological symptoms, physical impairments, and socioeconomic factors." (*Id.*) He stated that the wide disparity of the scores highlighted their subjective nature and the deficiencies of using them. (*Id.*)

The ALJ concluded at step four that Plaintiff could not perform any past relevant work. (Tr. 21.) He then concluded that given her age, education, work experience, and RFC, there were jobs in significant numbers in the national economy she could perform. (Tr. 21.) He cited the testimony of the vocational expert that someone with Plaintiff's limitations could be a linen room

attendant, mail clerk, or retail price marker. (Tr. 22.) Therefore, he found that Plaintiff had not been under a disability from May 1, 2009 through the date of the decision. (*Id.*)

## VII. ANALYSIS

Plaintiff argues on appeal that the ALJ erred in properly weighing the medical opinions and in his assessment of Plaintiff's credibility. The Court agrees on both counts.

### A. The ALJ Erred in the Weight He Assigned to the Medical Opinions

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam). According to SSA regulations, the Commissioner will give "controlling weight" to "a treating source's opinion on the issue(s) of the nature and severity of . . . impairment(s) [so long as the opinion] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003) (citation omitted).

The preference for a treating physician's opinion is generally justified because "[such] sources are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). By the same token, the opinion of a consultative physician, "who only examined a [p]laintiff once, should not be accorded the same weight as the opinion of [a] [p]laintiff's treating [physician]." *Anderson v. Astrue*, 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing *Spielberg v.*

*Barnhart*, 367 F.Supp.2d 276, 282–83 (E.D.N.Y.2005)). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Id.* (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir.1990)).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), now codified at 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not afford "controlling weight" to opinions from treating physicians, he needs to consider the following factors: (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion;" (3) "the opinion's consistency with the record as a whole;" and (4) "whether the opinion is from a specialist." *Clark*, 143 F.3d at 188; *accord Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir.2008). Although "[t]he ALJ is not required to explicitly discuss the factors," "it must be clear from the decision that the proper analysis was undertaken." *Elliott v. Colvin*, 13-CV-2673, 2014 WL 4793452, at *15 (E.D.N.Y. Sept. 24, 2014).

Furthermore, when a treating physician's opinions are repudiated, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33; *see Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999); *see also* 20 C.F.R. § 404.1527(d)(2) (stating that the Social Security agency "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion" (emphasis added)). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33 (stating that the Second Circuit will "not hesitate to remand

when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [the Second Circuit] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (changes in original omitted))).

Plaintiff had four treating physicians: (1) Dr. Fitelson, a psychiatrist who met with Plaintiff monthly between July 2010 and June 2011, although Plaintiff's sessions had to be by phone during the period when Plaintiff was on bedrest (Tr. 238–39); (2) Dr. Brandwein, a psychologist who met with Plaintiff on a weekly basis, with the first meeting in October 2007 and the most recent one taking place in June, 2011 (Tr. 228); (3) Dr. Keating, a psychologist who had treated Plaintiff intermittently since she was 17 years old, and then met with her again beginning in May, 2013 (Tr. 287); and (4) Dr. Tam, a psychologist who began treating Plaintiff on November 17, 2011. All three of the treating physicians who filled out Psychiatric/Psychological Impairment Questionnaires agreed that Plaintiff had marked limitations in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain ordinary routine without supervision, work in coordination with or in proximity to others without being distracted, complete a normal workweek without interruptions from psychological symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Fitelson and Dr. Brandwein further agreed that Plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods. All three physicians also agreed that Plaintiff experienced episodes of deterioration and decompensation in work settings, which would cause her to withdraw and/or experience exacerbation of her signs and symptoms. All three also reported that Plaintiff's

impairments were ongoing and would last at least twelve months, that she had "good days" and "bad days" and that she was likely to be absent from work more than three times per month. All three opined that Plaintiff could not function in a work setting. (*See* Tr. 226 (Dr. Brandwein opining that at the time of his letter, "the combination of mental health diagnoses, functional deficits, and stress from life events ma[de] it highly unlikely that [Plaintiff] would be able to secure and maintain any type of employment"); Tr. 238 (Dr. Fitelson opining that it was her opinion that Plaintiff was "currently not able to function in a work setting"); Tr. 286 (Dr. Keating writing that Plaintiff's symptoms "have made it impossible for [Plaintiff] to function in a work setting")). Nothing that Dr. Tam wrote in her treatment notes contradicts these findings.

In the face of the strong consensus by Plaintiff's treating physicians that she was not able to work, the ALJ reached an opposite conclusion based on thin and inconsistent reasons. The ALJ disregarded almost entirely the opinions of Drs. Brandwein and Keating, and disregarded most of the opinion of Dr. Fitelson. The ALJ's primary reason for disregarding these findings by two psychologists and a psychiatrist who all treated Plaintiff over time, was Plaintiff's reported activities of daily living, such as taking her children to school, driving a car, going on vacation, going to the park, and volunteering. In fact, Plaintiff's reported activities formed the bedrock of the ALJ's opinion; he also relied on them in finding that Plaintiff did not have marked limitations sufficient to meet a Listing at step three and in finding Plaintiff not credible.

Yet, this heavy reliance on Plaintiff's reported daily activities of self-care, child-care, and hobbies does not provide a sufficient basis for discounting almost entirely the well-supported expert testimony of licensed psychiatrists and psychologists regarding Plaintiff's ability to sustain a *job*. "Plaintiff's reports of her daily activities by themselves are not substantial evidence that she was not disabled and are insufficient to justify according [a treatment physician's] opinion limited

weight", because "a claimant need not be an invalid to be found disabled." *Nusraty v. Colvin*, 15-CV-2018, 2016 WL 5477588, *12 (E.D.N.Y. Sept. 29, 2016). "[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals[,] . . . it would be a shame to hold this endurance against him." *Id.* (quoting *Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998)). "Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Id.* (quoting *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014)); *Brown v. Comm'r*, 06-CV-3174, 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) (stating that the "excessive weight [the ALJ gave] to [the plaintiff's] performance of basic daily activities was a "legal error" and noting that "even to the extent that [the plaintiff's] daily activities were properly considered, the ALJ failed to place the burden on the Commissioner to show that those activities were evidence of [RFC] to perform full-time . . . work"). *See also Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000) (noting that for a person who suffers from an affective or personality disorder marked by anxiety, "the work environment is completely different from home", and that a doctor's observations that the plaintiff was "stable and well controlled with medication" did not "support the medical conclusion that [the plaintiff could] return to work").

Beyond the general inadequacy of statements of daily activity to show a claimant's ability to work, doing so is especially inappropriate here, in light of Plaintiff's diagnosis of bipolar disorder. Plaintiff's treating physicians all discussed the fact that Plaintiff vacillated between periods of depression—during which she would be tearful, irritable, low-energy, anxious, and isolated—and manic episodes—during which she would be high-energy, aggressive, spend money she did not have, enter chaotic relationships, and make poor decisions like driving drunk. While they opined that medication was helpful, all three doctors noted that situational stressors, such as

Plaintiff's divorce or her daughter's car accident, would sent her into depression and anxiety, notwithstanding her medication. Drs. Fitelson, Keating, and Brandwein all opined that work stress could exacerbate her symptoms as well. In light of this clear evidence of Plaintiff's unstable and changing behavior, her reports of activities such as traveling and volunteering, say nothing about her ability to maintain regular commitment and stability in a work environment. Notably, although Plaintiff testified that she could cook, shop, do laundry, and clean, she did not say that she could perform these activities on a regular basis.[12] *See Brown*, 2011 WL 1004969, at *5 ("[T]here is no indication in the ALJ's decision that the Commissioner was required to reckon how [the plaintiff's] occasional outings, relationship with a girlfriend, and episodic driving add[ed] up to an ability to" perform daily work activity as required by the SSA regulations). In fact, Plaintiff's treating physicians all agreed that she would be unable to do so on a regular basis.

Particularly inappropriate is the ALJ's reliance on certain behaviors that Plaintiff's treating physicians explicitly referred to as symptoms of manic episodes, such as traveling across the country and entering into romantic relationships. (*Compare* Tr. 19 (ALJ finding that Plaintiff's allegations of her limitations were not credible because, *inter alia*, she had traveled to Mexico and had actively been dating, *with* Tr. 238 (Dr. Fitelson explaining that during Plaintiff's manic or hypomanic episodes, she exhibited "self-destructive behaviors", including traveling across the country spontaneously and chaotic relationships)).

In addition, the VE explicitly stated at the ALJ Hearing that someone who could not be on task for at least 90 percent of the time could not sustain a job. Yet, the ALJ gave no explanation for his conclusion that Plaintiff could work consistently in light of the clear evidence to the

---

[12] In fact, Plaintiff's comment to this effect is not entirely clear, but seems to indicate that she could *not* perform these activities on a regular basis. ("Yeah, I mean I do all these things. It's just how on a regular basis." (Tr. 38.))

contrary, including the assessments of Plaintiff's treatment physicians and her termination from her last job, because she "couldn't keep up, couldn't prioritize, couldn't pay attention". (Tr. 42.)

The ALJ's other reasons for giving the treating physicians little or no weight are also insufficient. First, the ALJ noted that there were no treatment notes in the record from Drs. Brandwein or Keating. However, the ALJ had an "affirmative duty" to develop the record and "should have followed up with [the treating physician] to request supporting documentation or to obtain additional explanations for [their] findings." *Nusraty*, 2016 WL 5477588, at *13. *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (explaining that the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings"); *see also Ahisar v. Comm'r*, 14-CV-4134, 2015 WL 5719710, at *12 (E.D.N.Y. Sept. 29, 2015) ("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." (quotations omitted)).

Second, the ALJ relied on the statements of the treating sources discussing their hope or anticipation that Plaintiff *would* be able to work in the future, even while stating in the same opinions that Plaintiff was not currently able to work. The ALJ noted Dr. Fitelson's reports that Plaintiff's mood was becoming stable, and that her prognosis was good for returning to her prior level of functioning, and Dr. Brandwein's statement that with treatment Plaintiff would be able to return to work. The ALJ also relied on Plaintiff's statement that she hoped to find part-time work, and that she was volunteering. These optimistic statements about Plaintiff's ability to work *in the future* plainly do not support a finding that Plaintiff *did* make such improvements. Indeed, none

of the three treating physicians who opined on the matter found that Plaintiff *had* the ability to work at any time while they were seeing her.

Some of the ALJ's statements relied upon in reaching the opposite conclusion about Plaintiff's abilities were blatantly contradicted by the record. For example, he stated that "there is no evidence that . . . mental demands or changes in [Plaintiff's] environment would make her decompensate." (Tr. 16.) Yet, all three of Plaintiff's treating physicians who were asked, opined that Plaintiff experienced episodes of deterioration and decompensation in work settings, which would cause her to withdraw and/or experience exacerbation of her signs and symptoms. Not only does the ALJ not explain why he disregarded their opinions on this point, he does not even acknowledge these contrary opinions.

Furthermore, the ALJ erred in giving great weight to the opinions of the consultative examiners, Drs. King and Lopez. Because the consultative sources on which the ALJ relied only evaluated Plaintiff on one occasion each, their evaluations "convey[] only a snapshot of Plaintiff's symptoms on the day of the examination or, at most, for a brief period close to that time," in contrast to the reports of the treating physicians, whose opinions reflected Plaintiff's condition over the course of months or years. *Emsak v. Colvin*, 13-CV-3030, 2015 WL 4924904, *12 (E.D.N.Y. Aug. 18, 2015). The ALJ was thus required to give a much more detailed explanation of why he gave great weight to the opinions of Drs. King and Lopez. As discussed, the ALJ's conclusion that these opinions deserved deference because they were consistent with Plaintiff's reported activities of daily living is insufficient. His other reason—that these sources "based their assessment . . . on the results of [Plaintiff's] mental status examination and considered [Plaintiff's] subjective allegations and activities of daily living," (Tr. 19,) applies to a much greater extent to Plaintiff's treating physicians, who examined Plaintiff many more times over a longer period and

thus were "able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Indeed, the inappropriateness of the ALJ's reliance on these "snapshot" opinions of the consultative examiners is particularly acute here, given Plaintiff's diagnosis of bipolar disorder, which means that she is someone who, by definition, fluctuates between two very different states.

The Court cannot find that, in disregarding the remarkably consistent opinions of not one, but three treating physicians, the ALJ gave "good reasons." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999); 20 C.F.R. § 404.1527(d)(2) (stating that the Social Security agency "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion") (emphasis added). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33 (stating that the Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" (changes in original omitted))).

On remand, the ALJ should request the treatment notes, as necessary, from Drs. Brandwein and Keating, conduct a proper analysis of the weight to be given to the different medical sources, and if he or she decides not to give controlling weight to the opinions of Plaintiff's treating physicians, consider the requisite factors: (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion;" (3) "the opinion's consistency with the record as a whole;" and (4) "whether the opinion is from a specialist." *Clark*, 143 F.3d at 188. In addition, the ALJ should be aware that relying on Plaintiff's

reported daily activities will not support a finding that she is not disabled; and should strongly reconsider whether Plaintiff meets a paragraph B Listing, in light of the treating physicians' opinions regarding her marked limitations and episodes of decompensation.

### B.        The ALJ Erred in His Credibility Analysis

In assessing whether a claimant is disabled, the ALJ may consider the claimant's allegations of pain and functional limitations; however, the ALJ retains the discretion to assess the claimant's credibility. *See Fernandez v. Astrue*, 11 CV 3896, 2013 WL 1291284, at *18 (E.D.N.Y. Mar.13, 2013) (citing *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir.2010) and *Correale– Englehart v. Astrue*, 687 F.Supp.2d 396, 434 (S.D.N.Y.2010)). The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. 20 C.F.R. § 404.1529(b). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms [to] determine" the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18. Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the symptoms; and 7) other factors concerning the claimant's

functional limitations and restrictions as a result of the symptoms. 20 C.F.R. § 404.1529(c)(3) (i)-(vii).

The ALJ's reasons for finding Plaintiff not credible regarding the intensity, persistence, and limiting effects of her symptoms were essentially the same as the reasons he gave for discounting the opinions of her treating physicians, *i.e.*, she reported being able to perform certain daily activities, and she and her treating physicians made vague and aspirational statements about potential improvement in the future. For the same reasons as previously discussed, this is insufficient to undermine Plaintiff's credibility. The ALJ relied *heavily* on the first factor under § 404.1529(c)(3), *i.e.*, Plaintiff's daily activities, and appeared to ignore other important factors under that section, such as precipitating and aggravating factors, the *frequency* of her symptoms, and her other limitations. On remand, the ALJ should reassess Plaintiff's credibility using the correct analysis, and in light of renewed weighing of the other evidence.

## CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings and GRANTS Plaintiff's cross-motion. The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order.

The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2016
      Brooklyn, New York